2004 WY 149

**Daniel PERSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Defendant).**

**No. 03-103.**

Supreme Court of Wyoming.

Nov. 29, 2004.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; James C. Worthen, Student Intern; Diane Courselle, Director, Defender Aid Program; and Atoine Tissot, Student Intern. Argument by Ms. Corselle and Mr. Tissot.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Dee Morgan, Assistant Attorney General. Argument by Ms. Morgan.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, Daniel Person (Person), disputes the validity of his conviction for the crime of taking immodest, immoral or indecent liberties with a minor.[1] The crime was

---

1. § 14–3–105. Immoral or indecent acts; penalty.

(a) Except under circumstance constituting sexual assault in the first, second or third degree as defined by W.S. 6–2–302 through 6–2–304, any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is guilty of a felony. Except as provided by subsection (b) of this section, a person convicted under this section shall

committed on January 6, 2002. Person was 34 years old at that time. The victim of the crime will be identified as CC. CC was 15 years old at the time of the crime and is the son of one of Person's close friends from high school days. A friend of CC's, who was in the same room with CC at the time Person committed the crime, will be referred to as KT. KT was 11 years old at the time of the crime. KT was the son of another of Person's close friends, and Person was KT's godfather. Person contends that the district court erred by refusing to allow the admission of testimony from KT relating to Person's defense that CC had a motive to lie about the incident, that the prosecutor engaged in misconduct by exhorting the jury to convict Person for reasons other than those supported by the evidence, and by preconditioning the jury during voir dire. We will affirm.

## ISSUES

[¶ 2] Person provides this statement of the issues:

I. Whether the trial court denied Mr. Person his constitutional right to present a defense by refusing to admit testimony of KT.

II. Whether prosecutorial misconduct occurred when the State argued for the jury to convict Mr. Person for reasons other than the evidence and when the State preconditioned the jury during voir dire.

The State reformulates the issues somewhat:

I. Whether the trial court abused its discretion when it refused to admit KT's inadmissible testimony about the victim?

II. Whether the prosecutor's conduct of voir dire, or his closing argument, violated a clear and unequivocal rule of law in a clear and obvious way, resulting in substantial prejudice to [Person]?

## FACTS

[¶ 3] CC had known Person all of his life as a close family friend. On January 5, 2002, CC and his father were fixing a broken sewer pipe in the family home. Person arrived at CC's home, accompanied by KT who was also a friend of both Person and CC. KT asked CC if he wanted to go shooting with Person and KT the following day. The plan included that the friends would stay overnight with Person at his home. CC's parents agreed to let their son go with Person and KT. CC had spent a lot of time with Person and had stayed overnight at his house several times before, usually with KT also there. On the way to Person's house the three stopped at McDonalds to get something to eat.

[¶ 4] Once at Person's home, the three ate their food, watched TV, and played board games and cribbage. They went to a movie at about 9:30 p.m. After the movie they returned to Person's home to watch TV and fall asleep. KT slept on the floor in a sleeping bag, CC slept on the couch, and Person was sitting in a reclining chair. CC was clad in sweat pants that he had borrowed from Person and his own T-shirt. Around 3:00 a.m. Person went to bed, and CC continued to watch TV for a while longer. CC knew that

be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years, or both.

(b) An actor convicted under subsection (a) of this section shall be punished by life imprisonment without parole if:

(i) The circumstances of the crime involve a victim who was under the age of sixteen (16) at the time of the offense and an actor who was at least four (4) years older than the victim; and

(ii) The actor has two (2) or more previous convictions for any of the following designated offenses, which convictions resulted from charges separately brought and which arose out of separate occurrences in this state or elsewhere:

(A) A conviction under W.S. 6–2–302 through 6–2–304 or a criminal statute containing the same or similar elements as a crime defined by W.S. 6–2–302 through 6–2–304;

(B) Repealed by Laws 1997, ch. 135, § 2, eff. July 1, 1997.

(C) A conviction under W.S. 14–3–105(a), or a criminal statute containing the same or similar elements as the crime defined by W.S. 14–3–105(a), if the circumstances of the crime involved a victim who was under the age of sixteen (16) at the time of the offense and an actor who was at least four (4) years older than the victim.

(c) As used in this section, "child" means a person under the age of eighteen (18) years. Wyo. Stat. Ann. § 14–3–105 (LexisNexis 2003).

KT was asleep because he tried to talk to him and KT did not respond. CC looked and noticed that his eyes were closed and he was asleep. CC then fell asleep.

[¶ 5] The next thing CC remembered is waking up and finding Person with his hand up the leg of CC's sweat pants and feeling his testicles. CC was scared and thought of running out right away, but because he was scared ("I didn't really know what would happen if I woke up or if I stopped him."), he just rolled over and Person pulled his hand out of CC's pants and left. A short time later, Person returned and this time placed his hand into CC's pants under the waistband and began "rubbing" CC's penis. CC again turned over, but said nothing because he was afraid ("I didn't know if he would hurt me or not."). At this point CC was turned over onto his stomach and Person stopped. CC heard Person go through the kitchen and up the creaky stairs to his bedroom on the second floor of the house. CC then got up and dressed in all of his clothes, left through the sliding-glass door entrance of Person's house, and went home. CC's home was a considerable distance away from Person's house, and it took him almost an hour to make the walk/run home. The molestation occurred between approximately 3:45 and 4:30 a.m. CC said he left Person's house at 4:35 a.m. CC related that KT was asleep on the floor throughout this entire episode. CC thought of waking KT, but was afraid he would wake up Person if he did. CC was concerned about KT but wanted to get home first and tell his parents what had happened.

[¶ 6] During CC's journey home, Person apparently awakened and noticed that CC was gone. Person looked for CC for a time and it was Person shouting CC's name that awakened KT. Person called CC's parents to tell them that he could not find CC and did not know where he was. When CC arrived home, his mother was awake and grabbed him and asked him where he had been. CC told her that Person had "rubbed" him. CC went into his parents' bedroom, lay down on the bed and cried.[2]

[¶ 7] During his testimony, CC related that his parents had told him that if anything like this molestation ever happened to him, he was to tell them right away. CC indicated that he had not been taught to do that in school, nor had he discussed it with friends. He did not know anyone who had been fondled as Person had done to him, and it had never happened to him before. He did know what "molest" meant from school.

[¶ 8] CC's mother testified that she received a call from Person at about 4:30 a.m. on January 6, 2002, during which he reported that he couldn't find CC. CC's father left and drove to Person's house. CC's father called from Person's house and reported that they could not locate CC and that he had called the sheriff's office. Shortly after that, CC entered the back door of the family home and was confronted by his mother: "He was crying and freezing and he grabbed my shoulder and he said Dan had his hands down my pants. He laid down on my bed and cried." After CC's father returned to the family home, the police were called and CC related his story to the police.

[¶ 9] CC's father also testified about the late night call from Person and that he immediately got up and drove to Person's house. He testified that he and Person walked around Person's property calling CC's name, drove around the general area for a short time, and then went back to Person's house and called the sheriff's office. Shortly after that, CC's mother called Person's house to report that CC was home, and that he claimed to have been molested by Person. CC's father also testified that Person seemed more interested in what CC had said rather than his well-being. CC's father told Person what CC had said and then immediately left Person's house, for fear of what he might do to Person. He repeated the earlier testimony that the police were called and they came and took CC's state-

---

**2.** Person did not testify at his trial. KT was asleep and did not awaken until Person discovered that CC was gone. KT did not witness any of the events testified to by CC. The events related above are as they were told by CC and as pre-

sented through the testimony of CC's parents. When confronted with CC's report to his parents that Person had molested him, Person denied doing any such thing. CC's parents testified that Person denied committing the molestation.

ment, as well as the statements of the parents.

[¶ 10] KT was called as a defense witness and he testified that, although he stayed overnight frequently with Person, he had never been inappropriately touched by him. It is during KT's testimony that one of the central issues in this case arose. Person's attorney asked whether CC had ever told KT about having sex with someone, and the State objected to that line of questioning. The defense contended that the question was proper because it might have demonstrated a prior inconsistent statement by CC with respect to his sexual experiences. The district court sustained the objection. Defense counsel then moved to another line of questioning, which was how CC got along with his father. The State again objected and the district court sustained the objection on the basis of relevance. Defense counsel asked to make an offer of proof outside the hearing of the jury. Defense counsel contended that CC was often intimidated by his father and that he might be motivated to lie about the molestation incident because of that. The district court stuck to its ruling on unspecified grounds. KT also testified that he slept on the floor beneath the couch where CC was sleeping and that he did not wake up until he heard Person calling CC's name. KT testified that that was at about 1:00 or 2:00 a.m.

## DISCUSSION

**KT's Testimony**

[¶ 11] Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This Court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion. We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria. It also means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. In the absence of an abuse of discretion, we will not disturb the trial court's determination. The burden is on the defendant to establish such abuse. *Wilde v. State,* 2003 WY 93, ¶ 13, 74 P.3d 699, ¶ 13 (Wyo.2003) (citing *Willis v. State,* 2002 WY 79, ¶ 16, 46 P.3d ¶ 16 (Wyo.2002)).

[¶ 12] Person contends that the district court's evidentiary ruling limited his ability to question KT and took the heart out of his defense that CC was lying. Person's intended defense was that CC snuck out of Person's house on the night of January 6, 2002, to do something that his parents would not have allowed. The theory goes on to include that when CC got caught, he made up the story of the molestation because he was so intimidated by his father that he could not tell the truth about what he had done that night. This defense was premised in part on Person's contention that he had denied molesting CC. The evidence of that denial did not come in the form of testimony from Person himself, but rather through the testimony of CC's parents. When confronted with what CC said occurred, Person told CC's parents that he had not molested CC. Person did not cross-examine CC, CC's father, or CC's mother about this subject. The context in which this issue arose is critical to a sound analysis of the issue presented and so we set it out in detail:

Q. Tell me what you know about [CC] and his parents. Do they get along very well?

A. Yeah.

Q. Okay. What about his father in particular, does he get along with his father?

[Prosecutor]: Objection, your Honor, 404(b) and this is also improper under 608.

THE COURT: Sustained.

Q. Does he have any problems with his father?

[Prosecutor]: Objection, Your Honor.

THE COURT: Sustained.

[Defense Counsel]: Your Honor, I guess I would ask for a ruling on why I can't ask that question.

THE COURT: Based upon basic relevance.

[Defense Counsel]: I can show relevance, if you want me to do it [at] side bar.

THE COURT: Okay.

[Prosecutor]: I guess we need a hearing, Your Honor.

(A bench conference was held out of the hearing but in the presence of the jury.)

[Defense Counsel]: Um, Your Honor, my question to him is if he knows the relationship between [CC] and his father. I expect him to say that [CC] is sometimes intimidated by his father, that he yells at him, that kind of thing, and sometimes he's scared of him. That they have this relationship of that nature.

It's important in my case because it's one of those things I think I ought to be able to argue because he did not go home and may have been out and left Dan's house and thought he was going to get in trouble. And because of that, that's why he came up with this story that Dan had touched him. So I think it's important to show that he had that mind-set.

THE COURT: Well, the foundation issue with regards to—what are you talking about, observations that he had been talking about something else?

[Defense Counsel]: I'm asking for a specific statement of anything of that nature.

THE COURT: That he observed with the father?

[Defense Counsel]: Right. I can ask him that question.

[Prosecutor]: I would object to that 404(b) or 608, instances of conduct. I have no notice of 404(b). We haven't had a hearing on it. It would be an irrelevant thing, possibly drawing out hearsay. I think it's improper impeachment. Neither the father nor [CC] were confronted with these items. They don't have a chance to explain that.

THE COURT: I'll continue to sustain the objection.

[¶ 13] Person bases his argument in this regard on the Sixth [3] and Fourteenth [4] Amendments to the United States Constitution and Article 1, Section 10 [5] of the Wyoming Constitution. Person contends that he was deprived of testimony that would have been relevant, material, and vital to his defense. In support of this argument, Person cites *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984), for the proposition that:

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long

**3.** In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and the district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; and to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend VI.

**4.**

Section 1
Citizenship Rights Not to Be Abridged by States

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any

person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
U.S. Const. amend XIV.

**5.** **§ 10. Right of accused to defend.**

In all criminal prosecutions the accused shall have the right to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses, and to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed. When the location of the offense cannot be established with certainty, venue may be placed in the county or district where the corpus delecti [delicti] is found, or in any county or district in which the victim was transported.
Wyo. Const. art. 1, § 10.

interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." However, that case deals exclusively with a defendant's right to have delivered to him, by the prosecution, exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. We do not view the case as applicable to the question at hand. Person also calls our attention to *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982),[6] for the proposition that the Sixth Amendment guarantees a criminal defendant the right to secure the attendance of witnesses and that a defendant may not arbitrarily be deprived of testimony that would be relevant and material and vital to his defense. However, it goes on to say that a defendant cannot establish a violation of that constitutional right merely by showing he has been deprived of a witnesses' testimony. "He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Id.* First, that case appears to be limited to circumstances dealing with witnesses who have been deported by the government (and thus are unavailable to the defendant), but to the extent it has more general application, it appears to favor the State's position that Person was required to make a showing that the evidence KT might have provided was relevant, material, and favorable to his defense.

█ [¶ 14] We applied the *Valenzuela–Bernal* case in *Dysthe v. State,* 2003 WY 20, ¶ 5, 63 P.3d 875, ¶ 5 (Wyo.2003):

A violation of the compulsory process clause of the Sixth Amendment occurs when a defendant is arbitrarily deprived of testimony that would have been relevant, material, and vital to his defense. *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In *Taylor v. Illinois,* 484 U.S. 400, 407–09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), a case involving the violation of a pre-trial discovery order, the United States Supreme Court held that the compulsory process clause is not merely a guarantee that the accused shall have the power to subpoena witnesses, but confers on the accused the fundamental right to present witnesses in his own defense. *Taylor* further held, however, that although a trial court may not ignore a defendant's fundamental right to present witness testimony in his favor, the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. *Id.* at 410–16, 108 S.Ct. 646. The factors to be weighed in the balance include, but are not limited to the "integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process. . . ." *Id.* at 414–15, 108 S.Ct. 646.

[¶ 15] We will concede that some of the prosecutor's objections to KT's testimony were a bit far afield. However, the focus of the objections made, and of the trial court's concerns, was whether the evidence was relevant. It is evident that Person's "theory of the case" was balanced not so much on the head of a pin, as on the point of a pin. There was no evidence in the record at the time KT was called as a witness to even suggest that CC was so in fear of or intimidated by his

---

6. Person calls several other United States Supreme Court cases to our attention but we do not find them to be pertinent to our immediate discussion. *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (holding that Arkansas' per se rule excluding all hypnotically refreshed testimony infringed impermissibly on criminal defendant's right to testify on her own behalf); *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (holding that the exclusion of testimony concerning the circumstances of defendant's confession, on the ground that the testimony pertained only to the issue of voluntariness resolved against defendant in a pretrial ruling deprived him of a fair trial); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (exclusion of testimony that third person had confessed on several occasions to committing the murder with which defendant was charged deprived defendant of a fair trial).

father that he would be motivated to lie about the molestation, or that CC had been engaged in some sort of lark during the late night hours of January 6, 2002, so that he would need to lie to his parents.

■ [¶ 16] To be admissible, evidence must be relevant to some issue in the case:

For evidence to be admissible, it must be relevant. W.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In criminal cases, " '[e]vidence is always relevant if it tends to prove or disprove one of the elements of the crime charged.' " *Geiger v. State*, 859 P.2d 665, 667 (Wyo. 1993) (*quoting Grabill v. State*, 621 P.2d 802, 809 (Wyo.1980)).

*Gomez v. State*, 2003 WY 58, ¶ 6, 68 P.3d 1177, 1179, ¶ 6 (Wyo.2003).

[¶ 17] W.R.E. 401 "requires no more probative worth than that which reasonable persons would require in making thoughtful decisions in life outside the courtroom." 1 Christopher B. Mueller and Laird C. Kirkpatrick, Federal Evidence, § 82 at 392, § 83 at 396–97, (2nd ed.1994). W.R.E. 402 counsels that technicalities should be avoided and that reliable evidence of sound probative value should be admitted. 2 Weinstein's Federal Evidence, § 402.02[1] at 402–11 (2nd ed.2004). "However, the goal of ascertaining the truth is not always served by indiscriminate admission of all relevant evidence." *Id.*, § 402.02[2] at 402–11 –15. We deem the following thoughts from Professor Mueller to be applicable to what occurred in this case because the trial court's decision in this instance was made after all other evidence offered in this case was already in:

Like all evidentiary decisions, the trial judge decides relevancy questions on the run, one by one as the trial progresses, with succeeding decisions reached in the light of more and more actual information. This fact has unique significance for decisions of relevancy. The court can take steps to make decisions easier, but some relevancy questions are bound to arise in early stages when events and conditions are mostly in the shadows. The relevancy standard should be liberal, because a higher standard would mean rejecting more at the beginning of trial than at the end, and setting the standard at a modest level helps assure uniform administration and a fuller consideration of proof that bears on the issues."

1 Mueller and Kirkpatrick, *supra*, § 83 at 397–98.

[¶ 18] The evidence that defense counsel suggested 11–year–old KT might be able to provide was KT's assessment of the relationship between father and son (and what was in CC's mind) so that the fact finder might infer that CC had a motive to lie. The excluded evidence was, by nature, circumstantial evidence:

Sometimes circumstantial evidence is irrelevant. If it fails even to support the conclusion for which it is offered under FRE 401's generous standard, it should be excluded. Objecting parties commonly argue that circumstantial evidence is prejudicial under FRE 403 (inviting misuse or making the jury angry), but even without such concerns circumstantial evidence that fails the relevancy standard may be excluded simply because it requires inferential leaps that are too speculative. Sometimes circumstantial evidence is insufficient to support the conclusion for which it is offered, and the problem is not relevancy but sufficiency. Sometimes circumstantial evidence is excluded because proof of some additional fact is required before the evidence could support the point for which it is offered. In this situation, the court may treat the missing fact as a condition that must be fulfilled, and may either admit the evidence subject to a motion to strike, or insist that the conditional fact be proved first. Sometimes evidence is excluded as irrelevant if it seems clear that there is no other proof that supporting the proposition to which the evidence is directed and that evidence is insufficient to prove it without something more. Here the conclusion that proffered evidence is "irrelevant" really means that the court is insisting

that the proponent offer the missing evidence first or that the court is refusing to admit the proffered evidence without assurance that the missing point will be proved. Excluding proffered evidence because of the missing link separating it from the desired conclusion can avoid prejudice, confusion, and waste of time, which is proper under FRE 403.

1 Mueller and Kirkpatrick, *supra,* § 83 at 401–3.

[¶ 19] This brings us, then, to our final point in this regard, and that is the sufficiency of defense counsel's offer of proof. W.R.E. 103 provides:

(a) *Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) **Offer of Proof.—In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.**

(b) *Record of offer and ruling.*—The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer in question and answer form.

(c) *Hearing of jury.*—In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

(d) *Plain error.*—Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court. [Emphasis added.]

■ [¶ 20] In the context of evidentiary rulings at trial, this Court has long adhered to the doctrine that a sufficient offer of proof is necessary so that we are adequately apprised of the nature of the excluded testimony. *Skinner v. State,* 2001 WY 102, ¶ 39, 33 P.3d 758, ¶ 39 (Wyo.2001):

This requirement enables the trial court to be fully advised in the exercise of its discretion regarding the admission of evidence and allows the reviewing court to determine if prejudicial error resulted from the exclusion of the proffered testimony. Assertions and speculation in an appellate brief in no way take the place of an explicit offer of proof:

We suggest there is only one prudent way for an offer of proof to be made a[t] trial. The attorney who seeks to offer evidence, which has been refused or to which an objection has been upheld, should take the initiative. The offer of proof should then take the form of counsel's eliciting the proposed testimony directly from the witness, or entering the tangible evidence in the record, all outside of the hearing of the jury.

*Hermreck,* 956 P.2d at 338 (quoting *Rudolph v. State,* 829 P.2d 269, 275 (Wyo. 1992)). We conclude our appellate review was impeded due to the absence of an offer of proof and a clear indication in the record as to what the victim's testimony would have revealed.

*Also see* 1 Mueller and Kirkpatrick, *supra,* §§ 13–15 at 62–79.

[¶ 21] Upon careful examination of this question, we conclude the offered evidence was not relevant, or was at most conditionally relevant, and the necessary preconditions were not met. The offer of proof brought forward by Person did not meet the required standard. We hold that the district court did not err in refusing admission of the disputed evidence.

■ [¶ 22] A secondary matter concerns the trial court's refusal to permit defense counsel to question KT about what CC may have told him about sexual experiences CC had. During the cross examination of CC, defense counsel asked him about his prior sexual experiences, or conversations he

might have had with people about sex, and CC essentially denied having any. The State objected to that line of questioning but the district court permitted defense counsel to continue "a little bit." When defense counsel asked KT what CC may have told him about his prior sexual experiences, the district court sustained the State's objection. Defense counsel contended that he should have been permitted to ask those questions so as to reveal a prior inconsistent statement, i.e., that CC denied prior sexual experiences, and that KT's testimony might contradict that. Defense counsel made no offer of proof whatsoever in this instance. For much the same reasons as those set out above, in particular because there was no offer of proof tendered to the trial court, we conclude that the district court did not abuse its discretion in disallowing this evidence.

### Improper Voir Dire

[¶ 23] Person appears to group improper voir dire and improper argument to the jury as a single issue amounting to an allegation of generalized prosecutorial misconduct, grouping them together as a sort of compound or cumulative error. However, it is necessary to separate the two for purposes of discussion for a number of reasons, including that they are subject to different standards of review.

[¶ 24] Although he lodged no objections during voir dire, Person contends that the asking of the following questions constitutes a form of prosecutorial misconduct and/or a violation of a clear and unequivocal rule of law that prejudiced his case and violated his right to a fair trial. In the context of asking the jury panel about what their understanding of "evidence" was, a juror responded that she thought of "eyewitness accounts." The prosecutor then launched this line of questioning:

Now, can we all agree that it's probably best if when we know a crime is about to happen to kind of freeze time and take 12 of you over so you can all watch it and then start the clock so you can watch it happen and decide what happened and who did it. That would be great. Or maybe I can more realistically ask for the time

machine [ATM Machine?] so we can videotape everything and show you those tapes. But can you understand that doesn't always happen? Usually it's a rare occasion that we get lucky enough to have a videotape of the actual crime occurring?

So we have to do kind of the next best thing. We have to bring in people who did see it and have them tell you what they saw and ask you to decide the case upon that. You are going to hear from eyewitnesses during this case. And you are going to be asked to rely in making your decision on what they tell you.

Is there anybody here that absolutely could not make this kind of decision holding this man accountable based on what someone else is telling you they saw? Eyewitness testimony. Is there anyone who could not do that?

(No response.)

So we all agree that eyewitness testimony is a valid form of evidence?

(Nodded head.)

Okay. Now, we are human. One person may see it a little differently than other people, so you may get slightly different versions. And you understand that when that happens, it's going to be the lucky people that get set over here, it is going to be their problem to figure it out, piece together what actually happened. We all understand that and agree to it.

(Nodded head.)

Is there anyone that cannot find a person guilty in a criminal trial based only on eyewitness testimony?

(No response.)

Is there anyone that says—now I'm talking about in the pretend world now, you fully believe those eyewitnesses that they are telling you the truth, but is there anyone that feels that's just not enough? Okay.

[¶ 25] It is Person's contention that this was an effort by the prosecutor to precondition the jury to find him guilty even if the State was only able to produce the eyewitness testimony of CC.

[¶ 26] Person also claims the following questioning was designed to alert the jury to

the circumstance that there was no physical evidence in this case, so as to precondition the jury not to acquit because of that deficit (the context continues to be the jury's understanding of evidence, and the specific topic was DNA):

DNA, yeah. That alphabet thing. Alphabet things. A bunch of Gs and As and Ts put together to make that spiral thing. Who knows what it means? They can prove things with that. I trust them.

Okay. Let's talk about DNA evidence. Just like the videotape, you all understand that not every case has DNA evidence. Not every case has fingerprint evidence. These things have been around for a while, used a lot, but you don't them in every single case.

As a prosecutor I want as much evidence as I can. Sometimes you just don't have it. Like fingerprints, they've got to touch something before we can get a print from it. Unlike the crime scene investigators on TV, we can't get a print from every single thing. I wish we could.

And with DNA you've got to leave behind bodily fluid, blood, spit. I won't go any further. But you've go[t] to leave something behind so it can be tested to get some cells out of it. Do we all understand that?

(Nodded head.)

Is there anybody—kind of the same question, I want to make sure everybody understands. Is there anybody that could not find someone guilty unless we had something like DNA from a blood sample or a fingerprint or fibers? Is there anybody that absolutely has to have one of those things, something like that?

(No response.)

[¶ 27] Person also contends that the following lengthy exchange between the prosecutor and the jury demonstrates that the prosecutor's intent was to precondition the jury to his case (the context is the jury's understanding that the burden of proof in a criminal case is "beyond a reasonable doubt"):

Thank you sir. I appreciate that. There are certain things I'm going to have to prove to you, certain lists of things. Again, lawyers have to name everything, we call them elements. The judge at the end of the trial is going to instruct you what those elements are. It's a fancy word [way] of saying the who, the what, the when and the where.

Now those who haven't been in journalism class you realize I forgot one of the big five. Another "W" word why? Why? Did I just forget it? No. I intentionally left it out. The reason I did is I do not have to prove why. I don't have to prove why they did it. Fancy lawyer word, motive.

Some people think you have to prove motive in order to convict someone—why. I don't. I have to prove those other "W" words. Could anybody not find somebody guilty unless I told them why the defendant did it?

(No response.)

Has anybody here ever seen someone acting in a way they couldn't explain why they were doing that? Oh, come on. You haven't see some guy walking down the street talking to himself, swatting at bugs that aren't there. Okay.

Now that guy walking down the street that you saw, whoever it was that you saw, acting in a way you couldn't explain, you could not say why they did it. Any doubt in your mind why they were doing that, though, they were doing whatever it was that was odd to you, walking down the street talking to themselves, or whatever. Does that mean they didn't do it because you can't say why? Okay.

The plain truth is, folks, in an indecent liberties, child molesting case, I hope I can never tell the why. I hope I never understand. I don't want to understand, unless it will help stop it.

Those elements I talked about. On or about a certain date in Laramie County, Mr. Person knowingly took indecent, immodest, immoral liberties with a child. They will fill in that date for you. It's January 6th—I can tell you, It's no big secret—2002. Does anybody think I should have to prove more than that, the when, what, who and where?

. . . .

I've got to prove it beyond a reasonable doubt. Does anybody think I have to prove more?

. . . .

Indecent liberties, I'm going to get serious on you for a second, child molesting. What comes to your mind when I say indecent liberties? [To a Juror.]

[Juror] Doing [things] with the child that you shouldn't be doing. Sexual things.

[To a Juror] Sexual things. Does the sex of that child matter whether they are male or female?

[Juror] No—I mean, they do it whether it's female or male.

[To a juror] [D]o you think that in these cases child molesting, indecent liberties, force is necessary?

[Juror] No.

. . . .

With [the juror's] statement, does anybody think it makes a big difference whether it was a boy or a girl that was molested? We all agree boys and girls can be molested. We all agree you don't need to be forced. Okay. And I will say this as tactfully as I think I can. Is there anybody that thinks that in order for there to be molestation of a child there has to be some form of penetration?

(Nodded head).

I think we all know what I am talking about. Can we agree that there doesn't have to be penetration, you can molest a child without that?

(Nodded head.)

So we all agree that touching can be molesting?

(Nodded head.)

. . . .

Now, think about this, the age of the victim—I've been saying a child—the age of the victim. A child under Wyoming law is someone under 18. Does age matter? I'm not asking you legally. I'm asking what's in your heart. Does age matter? Some of you are thinking. I see the wheels spinning. I hope I'm ahead of you. How many of [you] think, well, a 16–year-old girl dating her 18–year–old boyfriend.

Are we talking about this? Let me clarify for you. Let me narrow the scope a little bit more. I'm talking about unwanted contact. Unwanted contact. Now does age matter? I got a lot of quick nos out of that one. A few people were still thinking about it. Unwanted contact in a child molesting case, we all agree as long as they are under age 18, does it matter? Anybody? Raise your hand. Who agrees to that?

(Raised hands.)

That's the important one. Does anybody disagree? Hands up if you disagree if you still think age is important.

(No response.)

. . . .

I'm asking for a good reason. It will be obvious when I ask the question. What should a child do if there is unwanted contact?

[Juror] Well, hopefully, report it to someone that you trust.

Tell someone.

[Juror] (Nodded head.)

Tell someone. Thank you. You all agree that's a good course of action, is to tell someone?

. . . .

Who are some of the people you can trust? [To a juror.]

[Juror] You would hope your parents. . . . Close friends. You know situations like that.

. . . .

Now, when I'm talking about the child molesting, does it matter whether the person doing it is a family member or a stranger? Is it still against the law?

(Nodded head.)

So we all agree that strangers can molest children?

(Nodded head.)

We all agree that people or family members or like family members can molest children.

(Nodded head.)

. . . .

It could happen. In fact, does happen. Okay. Now, when I was asking you what that should entail when there is unwanted contact, I asked [a Juror] for something else. Did anybody think of resist, fight? You did, sir?

[Juror] (Nodded head.)

You know that's a reaction you hear a lot. Are there any reasons, sir [to a Juror]?

[Juror] Uh-huh.

Can you think of reasons why the child didn't resist in a situation like this—unwanted contact?

[Juror] They are led to believe they can trust the person doing it.

They think they can trust the person. Okay. Anything else?

[Juror] Resisting would cause more damage.

Get hurt. That's a good reason. Trust or love of that person. That's one reason. Another reason is that you might be scared, you might get hurt. So, [to a juror], do you agree that the reason the child might not resist could be the child is scared?

[Juror] Yes.

And do you agree it might be reasonable for a child to be scared if they find themselves in a situation?

[Juror] Yes.

. . . .

Can we agree different children might react differently under the same circumstances?

(Nodded head.)

. . . .

What would you look for if you were that person that child came to? What type of thing would you look at to see if you believe that child? [To a juror]

[Juror] Any kind of trauma, tears, unusual behavior. If a child is trusting and has been truthful throughout their life, there would be no reason to think that they have made something up just for fantasy or to be exploited. . . . If there is any physical harm. . . . Flailing about in terms of their words that they are using,

animation or describing events or not, depending on the child itself.

. . . .

Is there anyone here that thinks absolutely, positively, a child is more likely to lie than an adult? Let me put it another way. You notice I do ask the same question in different ways. Can you all look at them on an individual basis?

(Nodded heads.)

Okay. Now, obviously, the law has decided—the law, the legislature, the people of Wyoming, have decided that some people—remember I said the law is to protect people from people. Some people need more protection. People under 18 for example, children. Can we all agree that taking indecent liberties with a child should be against the law? There should be a law protecting children from that.

(Nodded head.)

. . . .

Okay. A bunch of you raised your hands when I asked who had children? You don't have to raise them again. But to those who have children or one day will and for those who are going to have children, change the tense to make sense of this sentence. Any of you let your children stay over with other children?

(Nodded head.)

Okay. So no one thinks that itself is irresponsible?

(Nodded head.)

Is there anyone here who let's your children or child spend the night with a trusted adult, a family member or close friend of the family? I'm not talking about a baby-sitter-type situation, something like that.

(Nodded head.)

Anybody know of some who may not have done that? Maybe the children are too small so that opportunity hasn't arisen. Anybody ever do that?

(No response.)

[To a juror] [Y]ou're looking like you are thinking deep on that. Would you absolutely never let your child spend time with another adult outside of your supervision?

[Juror] Depends on the adult.

Depends on the adult. Very good answer. I appreciate that. That is true. I was assuming something and you know that old thing teacher tells you about assume when teaching you to spell it. Yeah, you know. I saw you laughing. I was assuming that was a person you trusted. Let me reask that question. Is there anybody that would absolutely never let their children stay over with an adult they trusted? Does that change for you, [juror], does it make it easier.

[Juror] Yeah.

There might be circumstances in which you let your child stay with an adult you trusted.

[Juror] Yes.

[¶ 28] In addition to preconditioning the jury to the facts of the case, Person also contends that the prosecutor questioned the jury regarding the law, as well as the meaning of words within the context of the law, so as to precondition the jurors to the circumstances of this case. Furthermore, Person contends that the prosecutor argued his case during voir dire and asked jurors what their verdict might be under certain hypothetical circumstances. Person asserts that because this case boiled down to whether the jury was to believe CC, or to believe Person, that it is readily evident that he was prejudiced by the wide-ranging and inappropriate voir dire that was allowed by the district court.

[¶ 29] The voir dire process is governed by statute,[7] rule, and an accumulation of jurisprudence on that subject. W.R.Cr.P. 24(c) provides:

(c) *Examination of jurors.*—After the jury panel is qualified the attorneys or a pro se defendant, shall be entitled to conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the judge, and the judge may conduct such further examination as the judge deems proper. The judge may assume the examination if counsel or a pro se defendant fail to follow this rule. If the judge assumes the examination, the judge may permit counsel or a pro se defendant to submit questions in writing. The examination shall be on the record.

(1) The only purpose of the examination is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.

(2) The court shall not permit counsel or a pro se defendant to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

(3) In voir dire examination counsel or a pro se defendant shall not:

(A) Ask questions of an individual juror that cannot be asked of the panel or a group of jurors collectively;

(B) Ask questions answered in a juror questionnaire except to explain an answer;

(C) Repeat a question asked and answered;

(D) Instruct the jury on the law or argue the case; or

(E) Ask a juror what the juror's verdict might be under any hypothetical circumstances.

Notwithstanding the restrictions set forth in subsections 47(c)(3)(A)-(E), counsel or a pro se party shall be permitted during voir dire examination to preview portions of the evidence from the case in a non-argumentative manner when a preview of the evidence would help prospective jurors better understand the context and reasons for certain lines of voir dire questioning.

[¶ 30] We have consistently held that the latitude allowed counsel during voir dire is within the sound discretion of the trial court:

Counsel are prohibited from trying a case during voir dire. *Jahnke v. State,* 682 P.2d 991, 1000 (Wyo.1984). Counsel may not "attempt to precondition prospective jurors to a particular result ... nor question jurors concerning the pleadings, the

7. *See* Wyo. Stat. Ann. § 7–11–105 (LexisNexis 2003).

law, the meaning of words, or the comfort of the jurors." W.R.Cr.P. 24(c)(2). Moreover, counsel may not "[i]nstruct the jury on the law or argue the case." W.R.Cr.P. 24(c)(3)(D). The latitude allowed counsel during voir dire is within the sound discretion of the trial court. *Gerard v. State*, 511 P.2d 99, 100 (Wyo.1973), cert. denied 414 U.S. 1072, 94 S.Ct. 585, 38 L.Ed.2d 478 (1973). On appellate review of voir dire, deference is given to the trial court's judgment under the abuse of discretion standard. *Summers v. State*, 725 P.2d 1033, 1041 (Wyo.1986), aff'd 731 P.2d 558 (Wyo. 1987); *Miller v. State*, 904 P.2d 344, 352 (Wyo.1995).

Defense counsel properly objected to the initial comments made by the prosecutor, and the trial court properly sustained the objection, along with an appropriate admonition directed at the prosecutor. As for the prosecutor's subsequent question concerning why a victim might deny the sexual abuse, there is a fine line between arguing the facts of a case and exploring possible prejudices among the venire. We find the trial court did not abuse its discretion in giving counsel some latitude during voir dire.

*Beartusk v. State*, 6 P.3d 138, 144 (Wyo. 2000); and *see generally* 2 Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 382 (Permissible Questioning), at 511–33 (2000 and Pocket Part 2004).

 [¶ 31] A trial judge has considerable discretion in deciding what questions may be asked of the jurors during voir dire, both in ruling on objections if the questioning is by attorneys or by refusing to ask questions requested by a party. 2 Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 381, at 500 (2000 and Pocket Part 2004). In this instance, defense counsel did not lodge any objections to the prosecutor's voir dire and, thus, we must review this contention of error under the plain error doctrine. *See Williams v. State*, 2002 WY 136, ¶¶ 22–25, 54 P.3d 248, ¶¶ 22–25 (Wyo. 2002); *Rands v. State*, 818 P.2d 44, 49–50 (Wyo.1991); and *Gresham v. State*, 708 P.2d 49, 55 (Wyo.1985). Under very similar circumstances we held as follows:

During voir dire, the prosecutor posed this series of questions to the jury panel:

I want to talk to you a little bit about the dynamics of being involved—in children being involved in a sexual abuse case, and you people, and people in general.

Does anybody have a problem with the notion that people use children for sexual gratification?

(No verbal response)

Is anybody here so innocent [as] to believe that that simply cannot happen in this society, in this community right here, in Casper, Wyoming? Does anybody believe that?

(No verbal response)

You would be surprised that once in a while that's true.

Does anybody here on this panel that I'm addressing believe that there is more proof required when a child is a victim versus when an adult is a victim?

(No verbal response)

First, we take note that no objections were made to any of the questions. We also note that during voir dire, counsel for the defense asked many questions along the same lines as those asked by the prosecutor. Indeed, this issue might have been posed in its opposite form had the questions asked by both sides been prohibited by the trial court. Metzger suggests that the questioning at issue violated the spirit and the letter of W.R.Cr.P. 24(c)(2) (improper for counsel to precondition jurors to a particular result, etc.). It is our view that the questioning at issue was consistent with, and was the sort of questioning contemplated by, W.R.Cr.P. 24(c)(1): "The only purpose of the examination [of jurors] is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict." This being so, we do not detect prosecutorial misconduct in the conduct of voir dire.

*Metzger v. State*, 4 P.3d 901, 910–11 (Wyo. 2000).

 [¶ 32] The plain error doctrine requires us to make this series of findings: (1) The record must clearly present the incident,

(2) appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way, and (3) that appellant was denied a substantial right resulting in material prejudice to him. *Schmidt v. State*, 2001 WY 73, ¶ 24, 29 P.3d 76, ¶ 24 (Wyo.2001).

[¶ 33] We have examined the voir dire with care. Although the district court might have been more aggressive in managing the voir dire process, it did allow considerable latitude to both sides. As set out in the authorities cited above, the limitations placed on voir dire by the Wyoming Rules of Criminal Procedure are flexible, and purposely so, so as to allow the trial court discretion in that important process. Although the incidents complained of are clear in the record, we are not persuaded that this voir dire violated a clear and unequivocal rule of law in a clear and obvious way. We also conclude that Person was not denied a substantial right resulting in material prejudice to him.

### Prosecutorial Misconduct in Closing

[¶ 34] Allegations of prosecutorial misconduct are reviewed by referring to the entire record to determine whether a defendant's case has been so prejudiced that he has been denied a fair trial. Whether a comment within a closing argument is improper is measured in the context of the entire argument. Reversal is warranted only if a reasonable probability exists that without the error the appellant may have enjoyed a more favorable verdict. The defendant has the burden to prove this issue. *Dysthe* ¶ 22. Closing arguments must be based upon the evidence submitted to the jury. *Trujillo v. State*, 2002 WY 51, ¶ 5, n. 2, 44 P.3d 22, ¶ 5, n. 2 (Wyo.2002). A closing argument provides to counsel ways of viewing the significance of the evidence. Both prosecutors and defense counsel may review the evidence and suggest reasonable inferences to the jury based upon this evidence. *Moore v. State*, 2003 WY 153, ¶¶ 29–30, 80 P.3d 191, ¶¶ 29–30 (Wyo.2003).

[¶ 35] At the very conclusion of a closing argument that consumes eight pages of the transcript, and which focused solely on the evidence pointing to Person's guilt, the prosecutor made this closing comment. "The State has shown you—no, [CC] has shown you what the evidence shows you; that is, Dan Person is guilty. He's guilty of betraying [CC]. He is guilty of taking indecent liberties with [CC], a child. That's why I ask you, that's why it's your duty to find Dan Person guilty." Person did not object and so the district court did not have an opportunity to correct the asserted error, to the extent it was erroneous. We have held that while such arguments are improper and discouraged such an isolated comment does not necessitate reversal. *See Wilde v. State*, 2003 WY 93, ¶ 26, 74 P.3d 699, ¶ 26 (Wyo.2003).

[¶ 36] In his rebuttal argument the prosecutor again urged the jury to convict because it "is your sworn duty" (Context: To convict in light of the evidence). Defense counsel objected and the district court sustained the objection. Defense counsel did not request further curative action from the district court. At the very end of his rebuttal the prosecutor urged the jury to convict because, "The right thing is to find him guilty." Defense counsel did not object.

[¶ 37] We have considered these incidents of alleged prosecutorial misconduct in light of the standard of review set out above. We have carefully examined the entirety of the argument in context and cannot conclude that Person was prejudiced by these fleeting comments, or that it is likely that the verdict would have been more favorable to him had they not been made. This is especially so in light of the district court's comprehensive instructions to the jury that it could only consider the evidence presented during the trial, and the instructions given by the court, in reaching its verdict.

### CONCLUSION

[¶ 38] Person was not deprived of his right to present a defense because the district court sustained objections to defense counsel's questioning of KT. The prosecutor's conduct of voir dire did not constitute plain error of such a fundamental nature that reversal is required. The prosecutor's closing argument, while flawed, did not deprive Person of his right to a fair trial or create a

likelihood that the verdict would have been more favorable to him had that flawed argument not been made. The judgment and sentence of the district court is affirmed in all respects.