[Criminal No. 941.   Filed May 12, 1944.]

[148 Pac. (2d) 829.]

## STATE OF ARIZONA, Appellee, v. CLIFFORD M. GEVREZ, Appellant.

Mr. W. E. Patterson and Mr. Edward S. Lyman, for Appellant.

Mr. Joe Conway, Attorney General, Mr. Thomas J. Croaff, Assistant Attorney General, Mr. Palmer C. Byrne, County Attorney and Mr. Charles McDaniel, Deputy County Attorney, for Appellee.

STANFORD, J.—Appellant was charged in the Superior Court of Yavapai County, Arizona, under information filed by the County Attorney, with the crime of murder in the first degree, the information alleging that:

" . . . at Ashfork Precinct, County of Yavapai, State of Arizona, on or about the 21st day of March, 1943, Clifford M. Gevrez did then and there wilfully, wrongfully, unlawfully, feloniously, premeditatedly, with malice aforethought and deliberately shoot, kill and murder one Gertrude Louise Gevrez, a human being."

April 4, 1934, the appellant married deceased; Gertrude Louise Swets, the marriage having occurred after a courtship of about two years. As issue of the marriage there were born two children, Charlotte, who was eight years old at the time of the killing in question, and Roger, who was then seven years of age. At the time of the killing by appellant of his wife, there was pending an interlocutory decree of divorce in the State of California.

When a youth the appellant was brought to Phoenix, Arizona, by his parents. Later they moved to Yuma, Arizona, where he attended high school and later worked for the Southern Railway Company as

a bell boy. Thereafter he enlisted in the United States Army. He served in the army for approximately 12 years and at the time of the killing in question, he was an inspector of airplanes for the United States Army, and immediately prior to the killing was stationed at Tucson, Arizona. While at Tucson he received notice that he had been transferred to San Diego, California. On the evening of March 20, 1943, he left Tucson by bus, after buying a round trip ticket to Ashfork. He arrived in Ashfork about six thirty A. M. on March 21st and went to the Harvey House where he washed and ate breakfast. About eight o'clock he went to the home of Mrs. Gevrez to visit his children. Upon knocking at the door his wife responded and he advised her that he had called to see the children. He was allowed to enter the house where the children were getting up for the day and they were called into the living room. During his conversation with the children Mrs. Gevrez left the home and went into town. Appellant took some presents out of his satchel and gave them to his children. At the request of his little girl, Charlotte, he went across the street to look at her playhouse. While at the playhouse he asked his daughter if anyone had been visiting them lately and she replied that there had been no one except Rol (meaning Rol Benner), and she told him that Benner was in the town at that time. When appellant and his little daughter reached the house again he went to his satchel, which he had brought from Tucson, and took out his pistol, and started uptown to find the man Benner. On his way to town he met his wife returning in her automobile and rode back to the home with her. A dispute followed when appellant asked her, after they reached the house, what she had done with her friend, Benner. A very heated argument occurred in the kitchen

at which place he fired four bullets into the body of Mrs. Gevrez and killed her instantly.

At the trial, by the verdict of the jury, the appellant was found guilty of murder in the first degree and the penalty fixed at life imprisonment, and the judgment of the court so followed and from such verdict and the judgment the appellant has appealed to this court.

The evidence in the case shows that one Rol Benner was the factor which broke up the appellant's home and alienated his wife; that Benner was a minister of the Gospel at Riverside while appellant and his wife lived there with their children. He was pastor of the Unitarian Church. They attended his church, and although he, the said Rol Benner, was married and had a child, the testimony submitted shows that he had to do with changing the love of Mrs. Gevrez from the time he first met her in Riverside in the year of 1938.

While deceased was located at Ashfork, having gone there about Thanksgiving in 1942, until the time of her killing on March 21, 1943, Benner had been in Ashfork and seen her either four or five times.

During a part of their residence at Riverside, the appellant was working at Santa Monica, and often when returning home would find Benner at his home. Later Benner was transferred to Berkeley where he became Dean of The Starr King School for the Ministry, and later Mrs. Gevrez went to Berkeley to take up duties as the librarian, she having previously qualified by attending a school at Riverside while they were living there. During these times appellant continued to carry out his inspection work for the United States Army at Santa Monica, California, and other places, and attempted to purchase a home near his work so he could have his family with him, but found some objection to that by Mrs. Gevrez. Later the Gevrezes moved to a rented home in Los Angeles,

and the testimony shows that the attitude of Mrs. Gevrez was cool toward this appellant. He found among her effects, a ring that had been given to her by Rol W. Benner with the initials of R. B. in the same.

The evidence furthers shows that in December, 1941, Mrs. Gevrez commenced divorce proceedings in California against the appellant, but they were later dismissed and a reconciliation was effected. In September, 1942, by mutual consent, the parties placed their children in a private school near Los Angeles. In December, 1942, the appellant commenced divorce proceedings in Los Angeles attempting to restrain his wife from taking their children to Arizona where she had obtained a position given her by reason of a course of study taken under the C. W. A. at Santa Monica, California, while the appellant was stationed at San Diego. The attempted restraint of the children was unsuccessful and on March 18, 1943, an interlocutory decree was entered in the last divorce proceedings and Mrs. Gevrez was given custody of the children with $80 a month for their support. The interlocutory decree mentioned gave the children jointly to the plaintiff and defendant, with personal custody in Mrs. Gevrez with the right of visitation by defendant.

Appellant submits fifteen assignments of error, but we feel it is unnecessary to take up each of the assignments, but it is our desire to pay our respects mainly to Assignment No. 4, which reads, as follows:

"The Court erred in appointing Dr. Seth F. H. Howes on its own motion to testify in the case against the appellant and in overruling appellant's objections to the Court's questions propounded to Dr. Howes; said appointment being made under Section 44–1702, Arizona Code Annotated 1939, which provides as follows:

" '*Appointment of expert witnesses by court.*— Whenever on a prosecution by indictment or information the existence of insanity or mental defect on the part of the defendant at the time of the alleged commission of the offense charged becomes an issue in the cause, the court may appoint one (1) or more disinterested qualified experts, not exceeding three (3) to examine the defendant. If the court does so, the clerk shall notify the county attorney and counsel for the defendant of such appointment and shall give the names and addresses of the experts so appointed. If the defendant is at large on bail, the court in its discretion may commit him to custody pending the examination of such experts. The appointment of experts by the court shall not preclude the state or defendant from calling expert witnesses to testify at the trial and in case the defendant is committed to custody by the court they shall be permitted to have free access to the defendant for purposes of examination or observation. The experts appointed by the court shall be summoned to testify at the trial and shall be examined by the court and may be examined by counsel for the state and defendant.'

"For the reason that Section 44–1702 is unconstitutional, violates Article 2, Section 24, of the State Constitution, and Section 4, Article 2, the due process clause of the State Constitution."

In addition to the plea of not guilty, the defendant entered a plea of not guilty by reason of insanity at the time of the commission of the offense, and while the foregoing assignment deals with the constitutionality of Section 44–1702, Arizona Code 1939, we are not going to say that said section is unconstitutional, but will dwell on that part of the assignment contending that the court erred in overruling objections to the court's questions propounded to Dr. Howes.

Dr. Seth F. H. Howes was Superintendent of the Arizona State Hospital, and is a man whose qualifications as a physician and psychiatrist are unques-

tioned. He was called and examined by the court during the trial to determine the mental condition of the appellant as of March 21, 1943, at the time of the alleged offense. The following were questions propounded and answers given:

"The Court: I believe at the request of the Court you have made some examination of the defendant sitting at the table there? A. I have.

"Q. In order to determine his mental condition as of March 21, 1943, at the time of the alleged offense here? A. I have.

"Q. Will you state briefly what you did in making that examination? A. Well, at first I had an opportunity to review and study the records that the County Attorney has regarding the case, including certain letters and the defendant's confession, and other records that he had of the case. I examined the defendant both physically and mentally on last Sunday and spent from nine thirty o'clock in the morning until one, and approximately I should say, to the best of my recollection, an hour and a half in the afternoon of the same day, and of course since I have been interested in the case I followed the newspaper accounts of the trial. I also interviewed Mrs. Swets and the defendant's two daughters on Sunday last.

"The Court: From the information you have received and the examination you have made, have you formed an opinion as to the mental condition of the defendant on that date? A. I have.

"The Court: For this trial I believe, as a matter of law, that the term insanity, as used in cases of this kind, means such a deranged condition of the mind as to render a person unable to distinguish between right and wrong and to understand the nature and quality and consequences of the act with which he is charged of having committed. With that in mind would you give us your opinion as to the mental condition of the defendant on March 21, 1943?

"Mr. Patterson: Just a minute, doctor. If your Honor please, at this time we wish to interpose an objection to the doctor testifying here to interrogation

by the court as prejudicial to the defendant; that it would have a tendency to influence the jury, causing this doctor's testimony to have more weight than other testimony given in the case, and that any such procedure used as the basis of a statute in this regard would be in violation of the defendant's constitutional right as provided by the Constitution; and furthermore I wish to make the further objection that he is basing part of his opinion upon information received outside of the evidence that is now before the jury.

"The Court: The objection is overruled. Will you answer the question, doctor?

"The Witness: It is my opinion that he was not insane on that day . . . ."

The thing that is objectionable about allowing such testimony is that the acceptance by the expert of information from newspapers, records of the county attorney, and information from the mother-in-law, who, as the record shows, never took the witness stand as to the sanity of the appellant, is not a proper basis for the opinion.

From the case of *McComas* v. *Wiley*, 1919, 134 Md. 572, 108 Atl. 196, 199, we quote the following:

"Opinion testimony, which is based upon the conclusions or inferences of other witnesses, is not admissible. . . . "

In the case of *In re Barber's Estate*, 63 Conn. 393, 27 Atl. 973, 979, 22 L. R. A. 90, the court said:

" . . . Among the matters which the witness was asked to assume to be true were that many different persons, after conversing with the testator and observing his conduct, believed him to be insane. We do not think such a belief of many others, presumably not experts, and opposed, as it doubtless was, by the contrary belief of many others, constituted a legitimate element of the basis of the opinion of the witness. By deciding upon that ground, he would not only assume the function of the triers, but would go

further, since they could only consider such opinions in connection with the facts on which they were based; while the witness had in reference to such opinions no facts, except that the many persons formed such opinions after conversing with the testator and observing his conduct. But there was no statement of the conversation or description of the conduct. Of course, we do not mean to intimate that, if these had been added, the fault would thereby have been obviated.''

20 Am. Jur. page 665 has the following to say:

''*Opinion Testimony of Others.*—The opinion of an expert witness when not based upon facts in his own knowledge or upon his own personal observation should be based upon facts testified to at the trial which, for the purposes of the expert's testimony, are assumed to be true. It is generally agreed that the opinion of an expert, however qualified to speak, cannot be predicated either in whole or in part upon the opinions, *inferences and conclusions of others,* whether expert or lay witnesses. . . . ''

From Underhill on Criminal Evidence, Section 163, is the following:

''*Expert evidence—What constitutes an expert— Physical examination of accused to ascertain sanity.*— The rule governing the admission of expert testimony is the same in criminal as in civil cases. When the sanity of the accused is in issue, the opinions of competent physicians or of expert alienists are generally admissible. The opinion given may be brought out by a hypothetical question containing the facts proved, or assumed to be proved, on one side or the other. The putting of a hypothetical question and the giving of an opinion on it is the better and customary practice, but where the expert has heard all the testimony bearing on the mental condition of the accused, and there is no conflict in the evidence, it is not error to permit him to give his opinion based solely upon the evidence as heard by him. So, also, an expert may give his opinion based on the evidence as stated in a hypothetical question and also upon an

examination of the accused made by the expert as a physician. An expert may give his opinion upon knowledge obtained and facts observed by the witness in treating or examining the accused professionally. Generally an expert witness will not be allowed to give an opinion on the evidence, unless it is embodied in a hypothetical question. To allow this would be to usurp the exclusive province of the jury and enable him to decide upon the credibility of the testimony. But an expert witness may, where the evidence is not conflicting and if he has heard all of it bearing on insanity, be permitted to give his opinion as regards the mental condition of the accused, based upon the facts in evidence, if true. . . . ''

■ By presenting one of the assignments counsel for appellant attached an affidavit made by Mr. Edward S. Lyman, one of his attorneys, which reads as follows:

''That during the course of said trial, Mrs. Swets, the mother of the deceased, sat within approximately four or five feet of the jury trying said cause, and during the opening statement outlining the evidence which the Defense expected to present to the jury, the said Mrs. Swets arose and shouted in the immediate presence of the jury, 'Stop it! Stop it! She's not here, she's dead!' and wept bitterly. That the statement of Mr. Patterson was interrupted and the jury noted the conduct of Mrs. Swets.

''That Mrs. Swets continued to sit within close proximity of the jury and on different occasions during the trial, wept bitterly and the Court Bailiff would, at various times during the trial, go over to Mrs. Swets, place her arms around her and console her.

''That Mrs. Swets attended the trial at the request of the County Attorney, but the County Attorney did not at any time, use her as a witness in the trial of the above entitled cause.''

The best witness in a trial sometimes never takes the witness stand; the greatest influence often comes

from the unsworn person who is allowed to parade before the jury. We cannot, however, find fault with the mother of the deceased, but we do say the laxness of the court in permitting her to remain so near the jury, and her deportment while there, were very prejudicial to the rights of appellant and should not have been allowed.

There was called to the witness stand by the state the little daughter of appellant, Charlotte Gevrez, and she held in her arms a doll. Upon cross-examination she answered the following questions:

"Mr. Patterson: Q. Charlotte, is that a new doll you have? A. No.

"Q. It is an old doll, isn't it? A. It was my mama's doll."

As stated in the brief of appellant, it probably would have availed nothing by objecting to the little girl's carrying the doll. It would even have made matters worse. Everything tends to show that it was prearranged that the little child would carry her mother's doll to the witness stand. This child was apparently groomed to be a witness who was able to know and understand everything that went on because on cross-examination she was asked the question as to what grade she was in at school and she answered: "I am going to be in the fifth grade." So, we have an instance of where a girl in the fifth grade carried her mother's doll in the trial of the case and the influence on the jury was not fair to the appellant, and it was a very strong appeal to the jury put forward by the prosecution, and while no error can be claimed by reason of it, yet it has the great tendency, as in the other matter just mentioned, to arouse the sympathy of the jury.

We hold that the defendant herein did not have a fair and impartial trial.

The case is reversed and remanded for new trial.

McALISTER, C. J., and ROSS, J., concur.