2005 WY 113

**George Kalei SMITH, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–61.

Supreme Court of Wyoming.

Sept. 9, 2005.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Tina N. Kerin, Senior Assistant Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General. Argument by Mr. Pauling.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] George Kallei Smith (Smith) appeals his convictions and sentences after a jury trial on five counts of third-degree sexual assault and one count of taking indecent liberties with a child. He claims plain error occurred when the prosecution used improper victim impact argument and testimony; his due process right to a fair trial was violated when, without objection, one of the alleged victims testified while holding a teddy bear; and two types of reversible error occurred during sentencing, *viz.*, unfounded, unproven information was used to penalize him and he was punished for not incriminating himself by expressing remorse to the probation and parole agent and the trial court.

[¶ 2] After careful review of Smith's claims, this Court does not find reversible error and, consequently, affirms the judgment and sentences following his convictions.

## FACTS

[¶ 3] The record, including the transcripts of the trial and sentencing hearing, reveals the following information. From late November of 2001 through early April of 2002, Smith repeatedly imposed himself sexually on his fourteen-year-old niece, DH. He began this activity by finding occasions to engage in conversations about sex, eventually becoming increasingly explicit and suggesting he could teach her. Then, while taking her driving in early December of 2001, he put his hand under her shirt and bra and rubbed her nipples, unbuttoned her pants, and touched her vagina with his hand, first above and then beneath her underwear. Approximately a month later, when DH and her brothers were spending the night at Smith's home and everyone else had gone to sleep while watching movies, he approached her again. He began to rub her vagina over her clothes but progressed to doing the same both over and under her undergarments. He then removed her shorts and underwear, spread her legs, and used his tongue on her vagina, telling her she made him "horny."

[¶ 4] That scene repeated itself in early February of 2002 when DH again spent the night as a prelude to a family get-together for the next day's Super Bowl. Then, early the next morning, apparently referencing his having performed cunnilingus on DH a few hours earlier, Smith again approached her and told her she needed to learn how to "return the favor." He then took out his penis and told her to suck on the top of it and rub it with her hand. Because she was afraid of making him mad, she "did it" for a couple of seconds when he started pushing her head down.

[¶ 5] DH again spent the night at her aunt's and Smith's home in early March to babysit while her aunt was out of town. Because Smith usually slept in the basement, DH went to sleep in her aunt's bed. Eventually, Smith entered the room, told DH no panties were allowed in that bed, removed her panties, and began to perform cunnilingus on her again. He then put on a condom and penetrated DH slightly with his penis, telling her he wanted to have sex with her and take her virginity. When the child resisted and pushed him, he removed the condom, and she put on her clothes and went to a spare bedroom to sleep. Undeterred, Smith followed her and told her, "If I can't

do you there, then I'll have to do you in the back." At that point, Smith had anal sex with the girl to the point of ejaculation. Later that month or in early April of 2002, while again babysitting for her aunt, DH again had her sleep interrupted when Smith digitally penetrated her vagina.

[¶ 6] Approximately a week later, DH once more spent the night at Smith's home. While trying to get to sleep in the basement, she heard what sounded like Smith and her aunt arguing. Later, Smith came to the basement in a seemingly angry mood, put on a condom, pulled down DH's underwear and put his penis in her vagina. Crying from the pain, the girl hid her tears until he was finished. She then rolled over, crying and shaking, and curled into a ball and went to sleep.

[¶ 7] Because she was scared and knew knowledge of these events would tear her family apart, DH did not report them to any adult until May 31, 2002, when a casual conversation with her parents about a gift for her mother led to an inquiry into whether there was anything she wanted to know about sex and if she had ever had sex. DH had tried to forget what Smith had done to her but could not due to the ways it had changed her. Her grades had gone down, she had lost friends, she became withdrawn, and she slept a lot during the day because she did not feel safe at night. After she confided in her mother and step-father, they first took the matter up within the family and finally reported it to the Powell Police Department on June 2, 2002.

[¶ 8] During the ensuing investigation, it came to light that Smith had molested another young female family member, RT, in June of 1997 when the then fifteen-year-old girl and her family had traveled from Minnesota to Powell for her mother's high school reunion. While RT was attempting to sleep in the basement of the home of Smith's mother-in-law, Smith put his hand down her pants and penetrated her vagina with his fingers. He then pulled down her shorts and got on top of her, trying to have intercourse with her and telling her not to worry—that he could not get her pregnant. The girl, however, squeezed her legs tightly together and

pushed him away. When he finally quit trying, Smith told RT, "Whoever takes your virginity is going to be a lucky man." RT never reported the incident at the time because she knew she would not have to see Smith again, and because she was afraid she would not be believed or be accused of having herself done something wrong.

[¶ 9] As a result of this investigation, Smith was charged on August 1, 2002, with seven felonies: Count I, the third-degree sexual assault of RT; Count II, taking indecent liberties with DH in December of 2001; Counts III, IV and VI, the third-degree sexual assault of DH in, respectively, January, early February and April of 2002; and Counts V and VII, the second-degree sexual assault of DH in, respectively, March and April of 2002. The Information was thereafter amended to correct the spelling of DH's name, to change the dates for the offense charged in Count VI—from April 1 through April 30, to March 28 through March 29—and to lower the second-degree sexual assault charges in Counts V and VII to charges of third-degree sexual assault.

[¶ 10] On October 29, 2002, Smith waived his preliminary hearing and was bound over to the district court where, on January 24, 2003, he was arraigned and entered not guilty pleas. His trial commenced on July 15, 2003. On July 18, the jury returned its verdict, finding him not guilty with respect to Count IV, but guilty of all remaining counts. Following a hearing on December 4, 2003, Smith was sentenced to a term of imprisonment of five to seven years on the indecent liberties count and to terms of eight to ten years on each sexual assault count. All terms were ordered to run consecutively except for those relating to two of the sexual assault convictions on Counts V and VI, which were ordered to run concurrently only to each other.

[¶ 11] Additional facts will be set out below in relation to the particular issues to which they pertain.

*Issue One:* **Whether plain error occurred when the prosecutor used improper victim impact argument and testimony.**

[¶ 12] Smith claims that the prosecutor used irrelevant victim impact argu-

ment and testimony which "permeated the trial, fatally tainting the evidence against" him. He recognizes that we must apply the plain error standard of review to this claim because he did not object at trial to the several instances he now identifies. Under that standard of review, he must show the record is clear as to the instances alleged to be error, a clear and unequivocal rule of law was clearly violated, and he was materially prejudiced by the error. *Person v. State,* 2004 WY 149, ¶ 32, 100 P.3d 1270, 1285–86 (Wyo.2004).

[¶ 13] The instances of argument and testimony about which Smith complains fall into three groups. In the first group, the instances concern the impact of Smith's alleged acts on DH; in the second group, the instances concern the impact of DH's reporting of Smith's alleged acts on the relationships of DH and DH's mother with other family members; and in a third group, Smith identifies one brief question-and-answer exchange between the prosecutor and victim RT as another instance of improper victim impact evidence.

### Impact of Smith's alleged acts on victim DH

[¶ 14] Smith identifies the following instances of argument and testimony in this group: 1) To the prosecutor's question why she had not reported her allegations earlier, DH answered:

I was scared, and I kind of knew it would tear my family apart. You know, I couldn't even imagine what kind of damage it would do, or if I'd ever be able to—you know, I know—too, I think I kind of also, I tried to ignore the fact that it happened as much as possible. But it didn't really work, because it changed me in a lot of ways.

The prosecutor then asked, "How did it change you, if you can articulate, if you can say?" DH responded:

My grades went down. I lost a lot of my friends. I lost my aunt, and she was like my best friend. After I told, I couldn't sleep alone by myself. I slept—I pretty much slept a lot of the day and stayed up a lot of the night. And whenever I did sleep in the night, early hours, I had to sleep upstairs in the living room, because I left the TV on and I had lights on, and so that way I could sleep with my dog because it made me feel safe.

2) In the prosecutor's closing argument, the prosecutor said:

He put on a condom, and he penetrated her vagina with his penis. And you recall her saying that that was the worst day of her life.

* * * *

Of course, [DH] further testified about—about the trouble she's had since these acts occurred, the trouble with sleeping. Of course, the worst part is the lost family relationships, particularly with Cindy. Her grades dropped. She testified she wouldn't sleep in the basement of her own house. She slept on the couch with the TV going. I think she said something about having the dog around all the time. Those were the kinds of things that [DH] testified to that bothered her, the kind of symptoms that she experienced since this has happened.

Dr. Jakai Hassler testified as an expert. She testified that she's counseled—you heard her testimony—numerous children, victims of sexual assault. You heard her testify about the research. She talks about various symptoms and characteristics of sexual assault, her experience, the research. She talked about those things with teenaged, minor victims of sexual assault, and then she talked about the kinds of symptoms [DH] demonstrated and that those symptoms were consistent with symptoms of victims of sexual assault, both that she's seen in her practice and in the research.

She testified to numerous symptoms: Fear on [DH]'s part, pain, stomachaches, headaches, fear, of course, that reporting would split up the family, general withdrawal, weepiness, clinginess to her mother, self-doubt, shame, guilt, a loss of sense of security, reduced interest in activities. She even testified to suicidal thoughts, sleep dysfunctions. [DH] testified about her sleep dysfunctions as well. So her

symptoms were consistent with those of victims of sexual assault.

\* \* \* \*

... [DH's mother] testified that [DH] no longer participates in family affairs. Her grades are down. She's moody. She's short-tempered with her brothers, depressed, sad. All these symptoms [DH] has demonstrated that are consistent with the story she told in court this week.

3) Smith asserts the testimony of prosecution witness Dr. Jakai Hassler, DH's counselor, served to reiterate and emphasize "the post-crime effects on DH." Dr. Hassler identified and described the typical behavior patterns of adolescent victims of sexual assault and abuse and then compared those patterns with DH's behavior, as related by DH and DH's mother, finding DH's behavior was consistent with those patterns. Smith correctly recognizes that Dr. Hassler's testimony neither vouched for DH's credibility nor concluded that Smith had sexually assaulted and abused DH.

[¶ 15] Because these instances are clearly revealed in the record, indeed the State does not argue to the contrary, the first part of the plain error standard of review is satisfied. The State and Smith part company, however, on the second part of that standard of review, namely, whether a clear and unequivocal rule of law was clearly violated. Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family. *Olsen v. State,* 2003 WY 46, ¶ 151, 67 P.3d 536, 592 (Wyo.2003); *Harlow v. State,* 2003 WY 47, ¶ 48, 70 P.3d 179, 196 (Wyo.2003). Smith argues that these instances of argument and testimony were irrelevant to the issues before the jury, relying on *Justice v. State,* 775 P.2d 1002, 1010–11 (Wyo.1989) (victim impact testimony inadmissible unless there is "clear justification of relevance"). The State counters that a clear justification of relevance was present in this case: DH's credibility. We agree. As the State explains, before trial Smith made it evident his defense would be based on his denial of DH's allegations and an attack upon her credibility. Six months

before trial, he gave notice of his intent to introduce alibi witnesses in relation to a number of those allegations—a fact noted by the district court three months later when, in the course of explaining its ruling during a motion hearing, it concluded his denial of the allegations had put the credibility of DH at issue in the case. The tenor of that issue became clear during defense counsel's opening statement at trial. At that time, defense counsel posited his theory that, for unknown reasons, DH had fabricated all her allegations and, because of the turmoil they had caused in her family and her resulting repetition of them to a therapist, soon found it too late for her to withdraw them and tell the truth. Defense counsel then characterized those allegations as unbelievable in light of the fact DH repeatedly kept spending the night at Smith's home after he had allegedly assaulted her and, during that time, she never gave any sign to her aunt or her parents as to what was allegedly going on.

[¶ 16] In order to counter that attack, the State introduced the evidence now challenged on appeal to convey to the jury: (1) the realistic pressures and fears which caused DH—in the absence of any overt threats by Smith, or his use of force or his position of authority as her uncle—to tolerate his assaults and delay reporting them; and (2) the countervailing pressures created by those assaults and her silence, which eventually caused that silence to be broken. Thus, DH testified that, while Appellant's conduct made her uncomfortable and scared, she did not report it for fear of the havoc such would cause in her family. She simply tried to forget it, but could not due to the deleterious effects it was having on her life. Then, after she broached the matter to her parents, her fears as to the effect such would have on her family were fully realized.

[¶ 17] DH's testimony relating to the personality and behavioral changes she experienced prior to reporting Smith's assaults was briefly corroborated by DH's mother, as was her testimony concerning the effect such reporting had on her family. DH's testimony regarding the pressures she experienced because of the assaults and her failure to report them was corroborated by her therapist, Dr.

Hassler, who first outlined the sort of anxieties and resulting symptoms commonly experienced by young sex assault victims. Dr. Hassler then noted the anxieties expressed to her by DH were among those commonly experienced by such victims and the observable symptoms of those pressures and fears DH was manifesting were likewise consistent with those observed in sexual assault victims. In particular, Dr. Hassler testified that the fear of adversely affecting one's family frequently causes such victims to delay reporting assaults for a considerable time, until "they can't hold onto it any more."

[¶ 18] Certainly, all such evidence was relevant to counter Smith's position at trial that DH should not be believed because, if her allegations were true, she would have reported them earlier. *White v. State*, 2003 WY 163, ¶¶ 17–20, 80 P.3d 642, 650–51 (Wyo. 2003); *Barnes v. State*, 858 P.2d 522, 534–35 (Wyo.1993). Because the challenged argument and testimony were relevant to DH's credibility and to Dr. Hassler's testimony, we hold Smith has failed to demonstrate the clear violation of a clear rule of law.

*Impact of DH's reporting of Smith's alleged acts on family relationships*

[¶ 19] In this group of instances, Smith identifies the following argument and testimony: 1) During his opening statement, the prosecutor said the testimony would show that DH lost her position in a fairly close-knit-type family and the State would call DH's mother to testify about the effect of DH's reporting on the family; 2) during DH's testimony, she described how her aunt, Smith's wife, used to be her best friend and role model, but now they no longer talked. She testified her grandmother no longer treated her as a granddaughter and would not have much to do with her. She also testified that the extended family had discontinued family get-togethers; 3) during the testimony of DH's mother, she testified that neither her sister, Smith's wife, nor her mother, DH's grandmother, would talk to her; and 4) during the prosecutor's closing argument, he variously mentioned the testimony of both DH and DH's mother concerning the lost family relationships and discontinued family gatherings.

[¶ 20] Smith and the State rely on their respective arguments made in connection with the first group of instances. The record is clear as to these instances; the parties disagree about the clear violation of a clear rule of law and whether Smith was materially prejudiced if a clear rule of law was clearly violated. We fail to see the relevance of this group of instances to the issues before the jury and hold, therefore, that these instances clearly violated the clear rule against irrelevant impact evidence. We also hold, however, that Smith was not materially prejudiced by the error. The quantity and quality of these instances was insubstantial in comparison with the quantity and quality of admissible evidence against Smith. In the total context of this case, therefore, we are persuaded that such error was harmless. Admission of evidence of this group of instances did not constitute prejudicial error.

*The question-and-answer-exchange between the prosecutor and victim RT*

[¶ 21] Again claiming another instance of improper victim impact evidence, Smith challenges the last question and answer in the prosecutor's direct examination of victim RT:

Q: Are you nervous today?

A: Very nervous.

The State invites us to consider the context of RT's testimony leading up to that brief exchange:

Q: Why did you report it [Smith's assault on her]?

A: Because I don't—

Q: Excuse me?

A: Sorry. Because I don't want it to happen to anybody else.

Q: Are you nervous today?

A: Very nervous.

[¶ 22] We agree with the State's argument that this testimony was not victim impact testimony. It is clear the prosecutor's question was directed not to the effect of Smith's crime on RT but to the stress she was experiencing with the unfamiliar circum-

stance of testifying at a trial. While RT's earlier testimony had by and large been clear, responsive, and cogent, immediately before the challenged question and answer she appears to have given either a halting or partially inaudible answer to a question why she had reported Smith's crime against her. The prosecutor then asked, "Excuse me?," and she apologized and gave her answer to what would presumably have been the State's last question. We find no merit in Smith's challenge to this testimony.

***Issue Two:* Whether Smith's due process right to a fair trial was violated when alleged victim DH testified while holding a teddy bear.**

[¶ 23] Smith claims that when fifteen-year-old victim DH testified while holding a teddy bear without any showing by the prosecutor that a compelling need existed for DH to hold the teddy bear, Smith's due process right to a fair trial was violated because DH's holding the teddy bear garnered improper sympathy from the jury. U.S. Const. amend. XIV, § 1; Wyo. Const. art. 1, § 6; *Belden v. State*, 2003 WY 89, ¶ 50, 73 P.3d 1041, 1089 (Wyo.2003). Smith concedes that he made no objection to DH's holding the teddy bear, and the State correctly notes that we must review Smith's claim under the plain error standard of review. *Person*, 2004 WY 149, ¶ 31, 100 P.3d at 1285.

[¶ 24] The State asserts Smith cannot show that the record clearly reveals that DH in fact held the teddy bear while testifying; even if DH held the teddy bear while testifying, Smith cannot show the existence of a clear and unequivocal rule of law prohibiting a witness's holding a teddy bear while testifying; and, even if DH held the teddy bear and a clear and unequivocal rule of law prohibited that, Smith cannot show material prejudice.

[¶ 25] Smith candidly recognizes that in that part of the trial transcript covering DH's testimony, there is no indication that DH held a teddy bear while testifying. The only reference in the record to this having happened is found in the closing argument of Smith's counsel at a point when he is commenting on a jury instruction that the jury is not to be influenced by passion or pity:

> Pity is something that is easy to feel for the witnesses on the stand. Remember the teddy bear that [DH] clutched in her hand. Remember the *Powerpuff Girls* T-Shirt. They're trying to present an image which I submit just simply isn't true.

Smith and the State disagree about whether this record reference establishes with clarity that DH actually held a teddy bear while testifying. The question is a close one, but we will agree with Smith that this reference establishes the fact with sufficient clarity for us to proceed to the second part of the plain error standard.

[¶ 26] Smith correctly notes first that this Court has never had the occasion to decide whether, or under what circumstances, a witness may testify while holding a teddy bear. Smith next refers us to a handful of decisions from courts in other states in his effort to establish the existence of the clear and unequivocal rule that the use of a prop such as a teddy bear or doll is a due process violation absent a compelling reason for the testifying witness to need a prop. In *State v. Palabay*, 9 Haw.App. 414, 844 P.2d 1 (1992), a sexual assault case, during the twelve-year-old victim's direct testimony defense counsel objected to the victim's holding a teddy bear, arguing the state had made no showing that it was absolutely necessary for the victim's comfort that she hold a teddy bear while testifying. The trial court overruled the objection. Later, but still during the victim's direct testimony, defense counsel repeated the objection. This time the trial court sustained the objection. *Id.* at 5. On appeal of his conviction to the intermediate court of appeals, Palabay argued the trial court abused its discretion when it failed to sustain his first objection, thus violating his constitutional due process right to a fair trial. The intermediate appellate court agreed. *Id.* at 7. In addressing this issue, the intermediate court of appeals noted that the Hawaii Supreme Court had not had occasion to consider the issue. *Id.* at 6. The court then turned to *State v. Cliff*, 116 Idaho 921, 782 P.2d 44 (1989), and *State v. Gevrez*, 61 Ariz. 296, 148 P.2d 829 (1944), *overruled in part on other*

*grounds, State v. Clark,* 112 Ariz. 493, 543 P.2d 1122, 1125 (1975), to both of which Smith has also referred us. In *Cliff,* a sexual assault case, when the eight-year-old victim entered the courtroom to take the stand while holding a doll, defense counsel objected; the trial court held a hearing outside the jury's presence during which the victim's court-appointed guardian ad litem testified about the victim's unease when testifying and opined that the victim would be put at ease if allowed to hold the doll. The trial court ruled the victim could hold the doll while testifying. 782 P.2d at 46. On appeal of his conviction, Cliff argued the ruling violated his due process right to a fair trial. The intermediate court of appeals disagreed. It accepted the trial court's conclusions that the benefit of having coherent testimony from the witness outweighed any possible prejudice to Cliff, and the doll could have a calming effect on the witness. *Id.* at 47. The Idaho court noted that in cases in which young children are witnesses the court must strike a balance between the accused's fair trial right and the young witness's need for an unintimidating environment. *Id.*

[¶ 27] In *Gevrez,* in which the accused was on trial for murdering his ex-wife, the accused's mother-in-law sat near the jury throughout the trial and wept bitterly on different occasions; also, the fifth-grade child of the accused and his deceased ex-wife testified while holding her deceased mother's doll. 148 P.2d at 832–33. On appeal of the accused's conviction, the Arizona Supreme Court reversed on three grounds: the sanity opinion of the state's expert witness rested on an improper basis, the mother-in-law's deportment during the trial was prejudicial to the accused, and it affirmatively appeared that the prosecution staged and prearranged the child witness's carrying the doll. *Id.* at 833. Interestingly, in its remarks about the carrying of the doll, the Arizona Supreme Court added:

> So, we have an instance of where a girl in the fifth grade carried her mother's doll in the trial of the case and the influence on the jury was not fair to the [accused], and it was a very strong appeal to the jury put forward by the prosecution, and *while no error can be claimed by reason of it,* yet it

has the great tendency, as in the other matter just mentioned, to arouse the sympathy of the jury.

*Id.* (emphasis added).

[¶ 28] In its brief, the State analyzes *Palabay, Cliff,* and *Gevrez* and concludes, correctly, we think, that Smith's reliance on them for showing the establishment of a clear and unequivocal rule of law is misplaced. Neither *Gevrez* nor *Cliff* established such a rule, as a plain reading of these decisions clearly reveals. *Palabay's* reliance on those two decisions as authority for such a rule seems ill-considered and ill-advised; moreover, *Palabay* is the decision of an intermediate appellate court, not the state's highest court.

[¶ 29] The State has also referred us to several other decisions on this issue which are worthy of note. In *State v. Marquez,* 124 N.M. 409, 951 P.2d 1070 (App.1997), a sexual assault case, trial defense counsel raised the issue of the twelve-year-old victim's testifying while holding a teddy bear. The state and the defense argued their respective positions; the trial judge reserved ruling until after opening statements, at which time the court held a hearing and both counsel and the court questioned the child. The court then ruled that the child could testify holding the teddy bear, explaining the child preferred it, the jury would not be prejudiced by its presence, and counsel could question the child about it. *Id.* at 1074. On appeal of the accused's conviction, the intermediate court of appeals affirmed, applying an abuse-of-discretion standard to review the trial court's ruling because New Mexico's counterpart to W.R.E. 611(a) allows the trial court latitude in exercising "reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, ... and (3) protect witnesses from harassment or undue embarrassment." *Id.* at 1072. The appellate court held that the trial court properly balanced the teddy bear's prejudicial effect against its calming effect. *Id.* at 1074. To similar effect is *State v. Hakimi,* 124 Wash.App. 15, 98 P.3d 809, 811–12 (2004).

[¶ 30] Having considered the authority offered by Smith and the State, we hold that Smith has failed to establish the existence of the clear and unequivocal rule of law for which he contends. Consequently, he has failed to show plain error on this issue.

*Issue Three:* **Whether reversible error occurred during sentencing.**

[¶ 31] Smith asserts that the trial court committed two types of error during his sentencing hearing. Smith claims the trial court used unfounded, unproven, and inaccurate information in the PSI report as well as his failure to admit guilt and express remorse as a basis for the sentences imposed.

[¶ 32] At the beginning of the sentencing hearing, the trial court determined Smith had "at least over a month" a copy of the probation officer's PSI report, which included that officer's opinions and sentencing recommendations. As required by W.R.Cr.P. 32(a)(3)(A) and (C), the trial court asked whether Smith had corrections to make in the report, and Smith's counsel said, "Your Honor, I don't believe we have any factual corrections to make. Of course, we will speak to the recommendation made, but there are no factual errors of any significance." Neither the State nor Smith made opening statements. The State called DH as its only witness who testified under both direct and cross-examination about the effects of the crimes committed by Smith against her. In summary, she testified she had been and was still suffering depression and post-traumatic symptoms for which she was receiving counseling and medication. She disclosed that, because of suicidal ideation and emotions of guilt, she had intentionally been cutting herself. She recommended that Smith receive a sentence of "forever if I knew it was realistic, but probably 50 years" because "I don't want anyone else to go through what I went through. And also, there's a fear of—that he might attack me or something of the sort." Smith presented no evidence.

[¶ 33] Both the State and Smith's counsel made brief closing arguments. The State's counsel spoke of "the continuing nature of those crimes committed against young females, vulnerable family members," the emotional trauma suffered by DH, the crimes' social and emotional impact on the two victims' lives, and the probation officer's recommendation in the PSI report, which included the statement that Smith had not shown remorse and remained adamant of his innocence. Smith's counsel spoke of Smith's maintaining his innocence, challenged the probation officer's "conclusion" that Smith was a sexual predator, asked the trial court to consider Smith's good record of having had a normal childhood, having attended school and college, having been a volunteer fireman, being the father of two young children, and having no prior convictions. The trial court asked Smith if he had anything to say, and Smith said no. After a forty minute recess, the trial court began its pronouncement of the sentence.

[¶ 34] In pronouncing the sentences, the trial court began by listing the counts involving the victim DH; it did not mention Count IV, on which the jury had acquitted Smith. The trial court then identified the count involving RT. Next, referencing DH's sentencing testimony, the trial court said it was no wonder that, at the end of the PSI report, the probation agent wrote:

> Before the court stands George "Keoki" Smith found guilty of six sexual offenses and pending sentencing. During the interview Mr. Smith showed no remorse toward the victims nor the extent of the damage and devastating impact he placed on not only the victims but their families as well. Mr. Smith was adamant of his innocence throughout the interview, stating he was set up. However, he was found guilty through a jury trial.

After reading that passage from the PSI report, the trial court remarked:

> Mr. Smith, if you were set up, you were set up by two different persons on incidents that had a spread of some four years, from 1997 to 2001. The jury didn't believe you, obviously.

The trial court then continued reading from the PSI report:

In the opinion of this agent the [appellant] is a sexual predator. He used his position as an adult in a close family to victimize friends of the family. He knowingly placed himself in situations that did benefit his sexual desires. Due to Mr. Smith's showing no remorse or regret toward the victims or their families, it is recommended that he be sentenced to the Wyoming State Penitentiary for a substantial period of time, as deemed appropriate by the Court, . . . .

After noting that the PSI report was ten pages long, the trial court stated:

And we consider the testimony of [DH] and her testimony about her fear, her feelings of guilt and blame, feelings so intense that she required treatment in the Wyoming Behavioral Center, where she was diagnosed with depression and posttraumatic stress syndrome. And it still is necessary for her to have ongoing counseling. For how long, we don't know. She even attempted to kill herself because of you, Mr. Smith.

The Court has considered and rejected any possibility of probation on these matters. We heard enough from [DH] today to realize the importance and necessity of removing you from society for a long time, not only for the protection of [DH] and [RT], but for the protection as well of other potential future victims.

The trial court then declared the sentences.

*Unfounded, unproven, and inaccurate information in the PSI report*

[¶ 35] Smith contends the sentences were the product of the trial court's abuse of discretion because they were based upon inappropriate information in the PSI report. Smith cites the probation agent's conclusion that Smith was a "sexual predator," the allegation that while bowling Smith patted DH's mother's butt, DH's mother's suspicion that Smith was unfaithful to his wife, and the allegation that Smith had put his hand on the thigh of one of DH's friends. Smith also contends that because the PSI report also contained the charging information with supporting affidavit for Count IV, of which the jury had acquitted Smith, and because the

trial court had read the report, the trial court must have also considered that information in arriving at the sentences.

[¶ 36] Responding to Smith's contentions, the State first notes that the trial court followed the sentencing procedure required by W.R.Cr.P. 32(a)(3)(A) and (C) when it afforded Smith and his counsel an opportunity to comment on the PSI report and to introduce any information relating to any alleged factual inaccuracy contained in it. The State correctly observes that Smith's counsel affirmatively stated, "I don't believe we have any factual corrections to make. . . . [T]here are no factual errors of any significance." In a similar case, this Court stated in *Christy v. State*, 731 P.2d 1204, 1207–08 (Wyo.1987):

A criminal defendant has . . . the further opportunity to deny or contest presentence investigation data or submit information in mitigation before the sentence is rendered. . . . In the absence of denial or objection by defendant, the court can rely on presentence reports . . . or other information, including trial testimony, as available in the file and otherwise uncontroverted, involving the events of the crime or relating to the character of the defendant.

Smith complains much about the probation officer's opinion that Smith is a sexual predator. But, as the State correctly responds, that is simply an opinion, not a "factual inaccuracy." In the State's view, and in this Court's view, such a characterization made in the context of the evidence in this prosecution, is not "fact," but "opinion." *See, e.g., Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 914–20 (Wyo.1992) (discussing fact versus opinion in the defamation context and identifying name-calling terms as "imaginative expression" and "rhetorical hyperbole"). The State also correctly notes that the trial court did not include Count IV when it identified the crimes for which it was sentencing Smith in its prelude to declaring those sentences. Because Smith affirmatively denied the presence of factual inaccuracies in the PSI report, did not introduce any testimony or other information relating to any alleged factual inaccuracy contained in the PSI report, and vigorously challenged the probation officer's

"opinion" in his argument to the trial court, Smith's contentions are without merit.

■ [¶ 37] In a final stab at the trial court's exercise of sentencing discretion, Smith contends, without cogent argument, that the inclusion of "this type of information" "appears on its face to violate the precepts of" *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The absence of cogent argument alone is fatal to this contention. But, because it is clear that Smith misunderstands *Apprendi* and *Blakely*, as the State explains, we shall briefly comment. In *Apprendi*, the Supreme Court noted that any fact which permits a trial court to exceed the maximum penalty set out in the standard sentencing category for a given offense—and to therefore place a defendant in a more severe category—was much like an element of the offense, requiring proof beyond a reasonable doubt. Accordingly, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363. The *Apprendi* Court drew a distinction, however, between a trial court impermissibly finding facts which place a defendant in a more severe sentencing category, and its exercise of discretion in imposing a sentence within the range permitted by a sentencing category whose use is supported by a jury verdict. With respect to the latter, the Court emphasized that sentencing judges were still free to exercise their traditional discretion in considering various facts relating to the crime and the offender in imposing sentence within the prescribed statutory limits. *Id.* at 481, 120 S.Ct. at 2358. In *Blakely*, the Court did no more than apply *Apprendi* to a sentence which departed from the standard sentencing range for the charged offense based on the trial court's finding of a fact that justified the departure, but which was not admitted by the defendant when he entered his guilty plea. *Blakely*, 124 S.Ct. at 2536–38. In the present case, the jury verdict on each count established all the facts necessary for the trial court to sentence Smith, as it did, according to the standard statutory sentencing range for each of the charged crimes. Under *Apprendi* and its progeny, the trial court was further free, in the exercise of its sentencing discretion, to consider victim impact statements, the PSI and other factors relating to Smith and his crimes in imposing an appropriate sentence within that statutory range. *Apprendi*, 530 U.S. at 481, 120 S.Ct. at 2358.

*Smith's failure to admit guilt and express remorse*

■ [¶ 38] Smith contends the sentences were the product of the trial court's abuse of discretion because they were based upon Smith's failure to admit guilt and express remorse toward the victims and the victims' families and about the harm he had caused. He points to the trial court's reading of that part of the PSI report which comments upon Smith's showing no remorse and maintaining his innocence. In support of this contention, Smith argues for the applicability of the holding in *Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), that in determining facts about the crime which bear upon the severity of the sentence, a trial court may not draw an adverse inference from the defendant's silence.

[¶ 39] In response, the State, while acknowledging these comments from the probation officer and the prosecutor and the trial court's reading of these comments before declaring the sentences, maintains that the trial court placed no emphasis on these particular comments. What the trial court did emphasize, the State asserts, was the probation officer's comment that Smith, in his interview with that officer, was adamant of his innocence, stating he was set up. Responding to those expressions of innocence and of having been set up, the trial court, as the State argued, addressed Smith, saying, "if you were set up, you were set up by two different persons on incidents that had a spread of some four years, from 1997 to 2001. The jury didn't believe you, obviously." As argued by the State, the trial court was referring not to Smith's silence but to Smith's own expressions. We agree with the State. Moreover, we also find it significant

that the trial court, immediately before declaring the sentences, said:

> We heard enough from [DH] today to realize the importance and necessity of removing you from society for a long time, not only for the protection of [DH] and [RT], but for the protection as well of other potential future victims.

[¶ 40] We also find Smith's contentions without merit for another reason. Having carefully read *Mitchell*, relied on by Smith, we believe that *Mitchell* does not apply here. To correctly understand the holding in *Mitchell*, one must understand the particular facts from which the holding emerged. Mitchell and twenty-two others were indicted for offenses arising from a conspiracy to distribute cocaine over a five-year period. Mitchell was charged with three counts of distributing cocaine within 1000 feet of a school or playground and one count of conspiring to distribute five or more kilograms of cocaine. *Id.* at 317, 119 S.Ct. at 1309–10. Without a plea agreement, Mitchell pleaded guilty to all four counts but reserved the right to contest the drug quantity attributable to her under the conspiracy count. The trial court advised her that the drug quantity would be determined at her sentencing hearing. Before accepting Mitchell's plea, the trial court informed her of the penalties for her offenses. In this regard, the trial court informed her that the punishment range was very complex because it was as yet not known what the prosecutor's proof of drug quantity was going to be in her case. The trial court told her that, for distributing cocaine near a school or playground, she faced a mandatory minimum of one year in prison; and for the conspiracy, she faced serious punishment depending on the drug quantity involved. In that regard, the trial court informed her that if the prosecutor's proof was at least five but less than fifteen kilograms of cocaine, then she faced a mandatory minimum of ten years in prison. The trial court explained to her that she would waive the right at trial to remain silent if she pleaded guilty. *Id.* at 317–18, 119 S.Ct. at 1310. The prosecution then explained the factual basis for the charges against Mitchell but withheld drug quantity proof until the sentencing hearing to be held later. Mitchell told the trial court that she had done some of what the prosecution explained and she confirmed her intention to plead guilty. The trial court accepted her plea. Later, at Mitchell's sentencing hearing, one of Mitchell's codefendants furnished information on the drug quantity attributable to Mitchell. According to this witness, from April to August 1992, Mitchell worked two to three times a week, selling one and a half to two ounces of cocaine a day; and from August 1992 to December 1993, Mitchell worked three to five times a week, and from January to March 1994, she was one of those in charge of cocaine distribution. Another witness's trial testimony indicated that Mitchell had sold him a total of two ounces in the course of three purchases. Mitchell offered no evidence at sentencing and she did not testify to rebut the prosecutor's drug quantity evidence. *Id.* at 318–19, 119 S.Ct. at 1310. The trial court ruled that Mitchell had no right to remain silent about the details of her crimes because of her guilty plea. The trial court found credible the prosecution's drug quantity evidence that put Mitchell over the five kilogram threshold, thus mandating a minimum sentence of ten years. That Mitchell had not testified to the contrary of the prosecution's drug quantity evidence was one of the factors which persuaded the trial court to rely on the prosecution's evidence. *Id.*, The Third Circuit Court of Appeals affirmed Mitchell's statutory minimum sentence of ten years, ruling that Mitchell's declination to testify on drug quantity could properly be held against her. *Id.* at 319, 119 S.Ct. at 1310–11.

[¶ 41] On Mitchell's appeal to the United States Supreme Court, the Court held that (1) neither Mitchell's guilty plea nor her statements at the plea colloquy functioned as a waiver of her right to remain silent at sentencing, *id.* at 321–25, 119 S.Ct. at 1311–13, and (2) at the sentencing phase of a criminal prosecution when the trial court is determining facts about the crime which bear upon the severity of the sentence, the government bears the burden of proving those facts, and the trial court may not draw an adverse inference from the defendant's silence. *Id.* at 327–30, 119 S.Ct. at 1314–16.

The critical fact about Mitchell's crime bearing upon the severity of her sentence was the drug quantity attributable to her. If the drug quantity was at least five but less than fifteen kilograms of cocaine, she faced a mandatory minimum of ten years in prison. That critical fact was contested at sentencing. An adverse inference as to the existence of that critical fact could not be drawn from Mitchell's silence about that critical fact.

[¶ 42] In this case before us, however, at Smith's sentencing hearing the trial court was not making a determination of facts about the crimes bearing upon the severity of the sentences to be imposed on Smith. The jury which had found Smith guilty of crimes against DH and RT had already determined the critical facts which had bearing upon the severity of the sentences. No contested critical fact about those crimes which had bearing upon the severity of the sentences remained for the prosecution to prove. *Mitchell* is inapposite and of no value to Smith in this aspect of his appeal.

## CONCLUSION

[¶ 43] Finding no reversible error in the several contentions raised by Smith, we affirm the judgment and sentences following his convictions.